## Appeal of AMERICAN SEATING CO.

Docket No. 4772.   Decided July 31, 1926.

1. Amounts paid for acquiring title to certain inventions represented by applications for patents and expenses incident thereto are capital expenditures and in the instant proceeding must be treated as elements of invested capital.

2. The cost of developing and perfecting the manufacture of a newly designed product is a capital expenditure and where such cost was so treated in the year in which it was incurred and was later charged off to surplus the taxpayer is entitled to reinstate the amount in surplus. *Appeal of Goodell-Pratt Co.,* 3 B. T. A. 30.

*Laurence Graves, Esq.,* and *Norman A. Young, C. P. A.,* for the petitioner.

*Thomas P. Dudley, Jr., Esq.,* for the Commissioner.

Before LITTLETON, SMITH, and TRUSSELL.

The taxpayer has petitioned for the redetermination of a deficiency in income and profits tax for the year 1920, asserted by the Commissioner to be in the amount of $33,892.60. Only such portion of the asserted deficiency is in controversy as results from alleged errors in the computation of invested capital, which alleged errors are as follows:

(1) That the Commissioner eliminated from invested capital the amount of $40,500, shown on taxpayer's books as the cost of certain inventions and application for patents relating to the use of steel tubing in the construction of school desks and seats.

(2) That the Commissioner eliminated from invested capital the sum of $198,712.37, a part of the claimed cost of developing the use of steel tubing in the manufacture of school seats and desks.

### FINDINGS OF FACT.

The taxpayer is a corporation organized under the laws of the State of Illinois in the year 1906, and since that time has been continuously engaged in the business of manufacturing and selling desks, chairs, and seats for schools, churches, theatres, and other places of public assembly.

Prior to 1911 the framework of the desks and seats was made of cast iron manufactured at the taxpayer's foundry. As early as 1909 it was found that the cast iron frame did not stand up under the hard usage of the school; that it was subject to breakage both in use and in transit, resulting in considerable economic loss.

In 1909 it was decided to substitute a steel frame for the cast iron one then in use, and the taxpayer's engineers were put to work on the problem and continued on the experimental and development work during 1910, 1911, and 1912. The change from the use of the cast iron frame, which was comparatively simple to manufacture, to the steel frame was a radical departure from the methods of production then employed. It required not only additional buildings, machinery, and equipment, new dies, jigs, tools, and patents, but a complete change in the specifications of the remaining wooden parts, as well as a period of experiment and development during which the imperfections in the plans and specifications must be discovered and corrected and the machinery of operations by which quantity production was to be reached adjusted to meet such changes. This petitioner was the pioneer in the manufacture of the steel standard desk and therefore could not benefit by the experience of others.

In 1910 new buildings were constructed and machinery and equipment acquired and installed, following which the manufacture of the steel standard desk was started. There was some little production in 1910. Real production began in 1911. The period of transition from the cast iron frame to the steel frame continued through 1911 and 1912. During this entire transition period the petitioner kept an accurate and detailed record of the cost of changing from the cast iron to the steel frame, and such cost so recorded upon the taxpayer's books of account on December 31, 1912, amounted to the aggregate of $398,934.39. All of this aggregate was regularly charged on the books of the taxpayer as capital expenditures and none of it was ever charged to operating or other expenses.

When the petitioner entered upon and began the development of the use of steel frames, it opened up on its books of account a capital

expenditure account under the designation of "steel construction." Into this account were charged many items of cost of material, labor, and superintendence.  The transition from cast iron to steel frame resulted in many imperfections in plans, specifications, tools, dies, jigs, etc., with the natural result that a large part of the production of parts, and sometimes of completed desks and seats, were found to be not marketable and were junked, and this, of course, required the junking of all jigs, dies, etc., the making of new ones, and the production of new parts, entering into the construction of a completed and assembled marketable desk.  Complete and accurate records of the cost of producing the steel standards were regularly kept from the beginning of the venture until the close of the year 1912.  The steel construction account appearing on the company's ledger for the years 1911 and 1912 is summarized as follows:

|  |  | Dr. | Cr. |
|---|---|---|---|
| 1911—January 1 | Balance brought forward | $96,446.87 | |
| | 33 items aggregating | 37,707.08 | $600.00 |
| Oct. 26 | St. Louis contracting acct. | 33,239.77 | |
| Dec. 30 | Steel operating loss | 55,296.55 | |
| | Debit balance | 222,590.27 | |
| 1912—January 1 | Balance brought forward | 222,590.27 | |
| | 40 items, aggregating | 66,164.09 | 118.00 |
| Dec. 31— | Operating loss | 110,180.05 | |
| | Debit balance | 398,934.39 | |

In the foregoing, items of operating loss for the years 1911 and 1912, summarized from the petitioner's ledgers, are exhibited as follows:

|  | Cr. | Dr. |
|---|---|---|
| Steel | | $58,215.54 |
| Finishing material | | 2,286.75 |
| Direct supplies | | 440.47 |
| Non. Prod. supplies: | | |
|     Dept. | $5,693.72 | |
|     H. L. & P. | 1,363.60 | |
|     General | 650.53 | 7,707.86 |
| Packing material | | 433.85 |
| Productive labor | | 45,511.69 |
| Non. Prod. labor: | | |
|     Dept. | $19,323.59 | |
|     H. L. & P. | 103.22 | |
|     General | 2,496.17 | 21,922.98 |
| Fixed charges | | 2,051.24 |
| Iron | | 4,790.95 |
| Packing labor | | 2,230.70 |
| Cutting crating | | 114.48 |
| | | 145,706.51 |

|  | Cr. | Dr. |
|---|---|---|
| *Brought forward* | | $145,706.51 |
| Shipments—credits | $47,620.57 | |
| Improvements—credits | 3,773.41 | |
| Inventory—12/30/11 | 54,955.96 | |
| | 106,349.74 | |
| Inventory—12/31/10 | 15,939.78 | |
| | | 90,409.96 |
| Loss | | 55,296.55 |
| Inventory Jan. 1, 1912 | | 54,955.96 |
| Productive labor | | 92,840.92 |
| Pro rate (factory overhead, such as supervision, foremen, and all labor in steel plant except productive labor) | | 82,148.38 |
| Steel consumed | | 114,198.65 |
| Iron room prod. labor Japanning | | 7,405.82 |
| Iron room pro rate on above | | 5,549.00 |
| Japan material | | 10,346.24 |
| Packing steel a/5612 and pro rate | | 9,135.09 |
| Packing matl. and cut crating labor | | 2,960.09 |
| | | 379,540.15 |
| School shipments stock and samp | $169,058.25 | |
| Church shipments | 252.14 | |
| Opera shipments | 6,038.49 | |
| Misc. shipments | 706.96 | |
| Transfers Iron Scrap (transferred to another factory) | 15,884.68 | |
| Improvements and pro rate | 4,240.38 | |
| Inventory Jan. 1, 1913 | 73,179.20 | |
| | | 269,360.10 |
| Difference loss | | 110,180.05 |

During the years 1911 and 1912 studies were made to determine the cost of producing each unit. From these studies it was determined that the cost of labor, materials, and overhead entering into the production of the salable articles was a certain amount per article. The taxpayer then determined that $55,296.55 of the amount expended during the year in the manufacture of the steel standards was properly chargeable to capital as experimental and development expense. This amount was arrived at in the following manner: To the opening inventory was added productive labor, factory overhead, cost of steel consumed, cost of painting and packing. The total so obtained represented the total cost of constructing the steel standards, sold during the year, junked during the year, and on hand at the end of the year. This total was then credited with (1) the shipments made, valued at a figure which the taxpayer had ascertained from its time studies of cost of production, to be the normal cost of producing a unit, that is, the cost of the material used in producing a unit, the cost of the productive labor necessary for its manufacture as well as the factory overhead cost attributable thereto. (2) Transfers of materials including junk and scrap, and (3) the inventory at

the close of the year valued in the same manner as the shipments out as in (1) above. The costs for 1911 so obtained exceeded the credits by $55,296.55, which, in the opinion of the taxpayer, represented the amount expended in the manufacture of steel standards properly attributable to experimental and development expense. This amount reflected the cost of material, labor, factory overhead, tools, jigs, dies, etc., used in manufacturing the units that were junked or scrapped during the year while in the process of construction.

This $55,296.55 was not charged to expense on the books of the taxpayer but was charged to its capital account "Plant and Properties." Furthermore, it was not deducted on the Federal excise-tax return filed for the year 1911 showing a net income of $79,207.83 and upon which the tax due was paid.

The amount charged by the taxpayer to capital account for 1912 for experimental and development expense, determined in the same manner as the $55,296.55 for 1911, was $110,180.05. Likewise, this amount was neither deducted on the taxpayer's books as an expense nor in the Federal income-tax return filed for that year showing a net income of $51,397.49 upon which the tax due was paid.

The first contract which the taxpayer procured for the steel standard desk was with the Board of Education of the City of St. Louis, Mo. The first production of the steel standard desk was under this contract. Before the order was completed certain weaknesses evidenced themselves, but under the contract delivery was guaranteed by a certain date. The desks were accordingly shipped, delivered and installed. Later on, and in 1912, it became necessary to manufacture new desks to replace the defective ones theretofore installed. The defective ones were junked. The cost in 1912 of replacing the desks junked was $33,239.77, which the taxpayer considered as representing the experimental and development expenses properly attributable to this particular contract. This $33,239.77 was therefore charged to capital by the taxpayer as experimental and development expense and not charged to expense on the books or in the income-tax returns filed for that year, which, as previously stated, showed a net income of $51,397.49 upon which tax was paid.

After having deducted from the total cost of manufacturing the steel standards sold, junked, and on hand at the end of the years 1911, and 1912, the $55,296.55 and $110,180.05, respectively, for experimental and development expenses, the percentage of factory costs to school sales, that is, the cost of the complete marketable desk, including the steel standard as well as other parts, was a greater percentage of the sales price than in the years prior and subsequent to the experimental period 1910 to 1913, inclusive, as is shown by the following tabulation:

|      | School sales | Factory costs | Per cent |
|------|-------------:|--------------:|---------:|
| 1908 | $298, 160. 79 | $182, 536. 03 | 61. 1 |
| 1909 | 294, 608. 13 | 178, 675. 33 | 60. 7 |
| 1910 | 247, 176. 02 | 157, 859. 64 | 63. 8 |
| 1911 | 298, 684. 96 | 187, 932. 56 | 62. 9 |
| 1912 | 629, 672. 02 | 430, 346. 70 | 68. 3 |
| 1913 | 769, 655. 78 | 549, 333. 63 | 71. 4 |
| 1914 | 758, 353. 42 | 472, 516. 36 | 62. 3 |

The $398,934.39 charged to the taxpayer's capital account "Plant and Properties," on account of experimental and development expense during the period in which the steel standard desk was being developed and perfected, remained in the "Plant and Property" account until 1914, when, upon the recommendation of accountants engaged in auditing the taxpayer's books, it was eliminated from that account and surplus account was charged with a like amount. This was a surplus adjustment, not an income adjustment, and the income for 1914 as shown by the books for that year was not affected in any manner by the adjustment, nor did the income shown by the Federal income-tax returns filed for that year reflect the adjustment.

Later on, and in 1919, the entries made in 1914 charging off against surplus the $398,934.39 of experimental and development, were reversed upon the recommendation of accountants and the amount was restored to the "Plant and Property" account as well as to surplus, where it remains today.

On or about the 3d day of March, 1911, the petitioner entered into a so-called agreement of license with the Welded Steel Products Co., a Delaware corporation, which recited that the said Welded Steel Products Co. is the "owner of inventions for certain new and useful improvements for which patents have not yet been issued or applied for but for which it is intended to make application for letters patent as soon as possible," and further, that "such inventions comprise a method of steel construction particularly applicable in and adapted to the manufacture of seating furnishings and fittings for schools, educational institutions, places of amusement or congregation, opera houses, theatres, temple halls, churches or places of worship," and further, the said agreement in the usual and proper language granted to the petitioner and its assigns full and exclusive license and authority to manufacture and sell all kinds of seatings, furnishings, and fittings, for schools, etc., embodying or containing, or made in accordance with, the methods of such inventions, and in consideration of such grant of license the petitioner undertook to pay to the licensor certain specifically described royalties upon all articles manufactured and sold under such inventions.

Thereafter, and on or about August 3, 1915, the petitioner and the Welded Steel Products Co. entered into another written agreement which contained, among other things, recitals as follows:

WHEREAS, under date of the 3d day of March, A. D., 1911, the parties hereto entered into a certain AGREEMENT OF LICENSE with reference to certain inventions for certain new and useful improvements, for which patents at said date of March 3, 1911 had not been issued or applied for, but for which patents upon a part of said inventions have subsequent to said March 3d, 1911 been applied for,

＊       ＊       ＊       ＊       ＊       ＊       ＊

WHEREAS, the parties to said AGREEMENT OF LICENSE have, subsequent to the execution and delivery thereof, been operating, manufacturing, selling and governed thereunder by said AGREEMENT OF LICENSE, and certain sums of royalty have been paid by the SEATING COMPANY to the PRODUCTS COMPANY under said AGREEMENT OF LICENSE, ＊ ＊ ＊.

Now THEREFORE IT IS NOW AND HEREBY AGREED between the parties as follows:

(1) : The parties hereto agree and certify that they have had between them an accounting under said AGREEMENT OF LICENSE of March 3d, 1911, and have struck a balance in the matter thereof and found nothing due from either to the other, and each party, for a mutual consideration received, releases, discharges and acquits the other of any claim or demand of any kind or nature whatsoever growing out of said AGREEMENT OF LICENSE of March 3d, 1911, or any acts or things done thereunder or with reference to the matters and things therein provided for.

＊       ＊       ＊ ·       ＊       ＊       · ＊       ＊

(3) : For and in consideration of the sum of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) in hand paid by the SEATING COMPANY to the PRODUCTS COMPANY (receipt whereof is now and hereby acknowledged) and of the covenants and agreements herein contained, the PRODUCTS COMPANY hereby sells, assigns, transfers and sets over to the SEATING COMPANY, all its rights, title and interest in and to said inventions and applications for patents thereon, or patents, if issued. It is further understood and agreed that the PRODUCTS COMPANY in no way guarantees the validity of any patent or inventor's rights in the matter of said inventions.

On or about the said 3rd day of August, 1915, the petitioner, pursuant to the agreement last above referred to, purchased the patents and inventions in said agreement described and thereupon paid to the Welded Steel Products Co. the sum of $15,000 in settlement and adjustment of all royalties due under the contract of March 3, 1911, and the further sum of $25,000, the purchase price of said inventions and patents as agreed to in the agreement of August 3, 1915; and at or about the same time the petitioner paid to its legal counsel a fee of $500 for legal services in connection with the making of said contract and counsel and advice relating thereto, and on December 3, 1915, it caused to be made journal vouchers as follows:

|  |  |  | Debit. | Credit. |
|---|---|---|---|---|
| 9540 | 73 | Plant & property (exp. and del.) --------------- | $500. 00 |  |
|  | 34 | Sheridan Wilkerson & Scott-------------------------- |  | $500. 00 |
|  |  | Legal advice in connection with purchase from the Welded Steel Products Co. |  |  |

| 9541 | 73 | Plant & property (exp. and del.) | $40,000.00 | |
| | 34 | Welded Steel Products Co | | $40,000.00 |
| | | In full for all royalties under contract dated March 3, 1911 | | $15,000.00 |
| | | In full for all rights, title and interest in inventions and applications for patents thereon, or patents if issued, owned, and to be owned by the Welded Steel Products Co. as per contract dated Aug. 3, 1915 | | 25,000.00 |
| | | | | 40,000.00 |

The entire amount of $40,500 so paid was considered by the petitioner as its cost in acquiring the patent and was then charged to its capital account, "Plant and Properties," and not to expense, and the whole amount of said sum has at all times remained in the petitioner's capital account and it so remains at this time.

In auditing the petitioner's income and profits-tax return for the year 1920, the Commissioner eliminated from invested capital the items of $40,500 charged as cost of patents and inventions. He also eliminated the item of development expense relating to the so-called St. Louis contract, $33,239.77, and the so-called operating loss items of $55,296.55 for the year 1911, and $110,180.05 for the year 1912, aggregating $198,712.37.

OPINION.

SMITH: Moneys paid for patents or for the exclusive right to use designs and inventions, whether patented or not, have been so generally recognized as capital expenditures that any argument or citation of authority in support thereof would seem to be superfluous. In 1911 the petitioner acquired by written contract exclusive license to use certain unpatented designs and inventions and agreed to pay and apparently did pay royalties for such use. In 1915 it acquired title to such inventions then held under applications for patents and paid therefor a purchase price of $25,000, together with counsel fees in connection with the acquirement of such title in the amount of $500. It appears that no one can question the fact that these payments, aggregating $25,500, are capital expenditures and immediately upon such payments being made become a part of the invested capital of the petitioner.

The payment of $15,000 by the petitioner to the Welded Steel Products Co., at or about the same time that it purchased title to the inventions, appears from the record to have been the sum of three payments made in settlement of the petitioner's obligations under the contract of 1911 for the payment of royalties. It is not clear why the petitioner capitalized this amount. It may be that this $15,000 represents royalties upon manufactured articles which proved to be defective and were therefore junked, and if such facts were shown the petitioner's assignment of these payments as capital expenditures might under the circumstances have been warranted, but the testi-

mony offered does not prove that the $15,000 was anything other than the usual royalty payments under the contract of 1911. We are, therefore, of the opinion that that amount can not under the circumstances be treated as a capital expenditure.

The petitioner, who had up to 1909 been engaged in the manufacture of school desks and seats with cast iron frames, determined in 1909 to substitute steel frames for the cast iron frames. This was a new and at that time untried business venture. The petitioner was in possession of no designs, patterns, tools, or machinery fitted for the manufacture of such steel frames and it could not procure them from other manufacturers. It was therefore under the necessity of employing skilled engineers and mechanics to develop designs, patterns, tools, and machinery, and, according to the testimony in this case, such development covered a transition period from 1909 until after the close of 1912. By the close of the period the petitioner had an established business of comparatively large proportions and had had a number of years experience in such business. Apparently, its management was in the hands of business men of experience and ability and its engineers and accountants were as capable as the going rates of wages and salaries could command. It had a thoroughly efficient cost accounting system by means of which it was able at all times to keep itself informed as to the true cost of every article manufactured and sold. When it determined to venture into the field of manufacturing steel frames for school desks and seats it set up, in accordance with approved accounting methods, a capital account in which it entered material, labor, and overhead cost of developing the new business of making such desks and seats with steel frames. It is universally recognized in such cases that much capital must be put into development costs, and the record in this proceeding shows that in this case thousands of dollars worth of material and labor were expended in the production of designs, patterns, tools, and machinery which failed at first to produce results; that in the early days in the production of desks and seats with steel frames many such articles manufactured were found to be defective and were necessarily junked. The charging of all of these costs of experimentation, of materials lost, and of labor employed, as capital expenditures was apparently done in accordance with sound business judgment and approved accounting methods. So far as the record shows, the three items of development cost capitalized by the petitioner and eliminated by the Commissioner were just as much entitled to classification as capital expenditures as were the items which the Commissioner has allowed as capital expenditures.

In the ordinary conduct of a manufacturing business the differentiation of capital expenditures and operating expense disburse-

ments is largely a matter of sound discretion and experienced business judgment. The dividing line between the two classes can not be defined by statute and, so far as has come to our attention, no court has ever yet attempted to make a definition that can apply to any case except the one under review. We are thus led to the conclusion that on December 31, 1912, the amount of the petitioner's capital which had been expended in developing and perfecting the business of producing school desks and seats with steel frames was the sum of $396,884.13, and that that amount, constituting a part of $398,934.39, was then properly carried on its books as a capital asset.

The taxpayer has continued to manufacture school desks and seats with steel frames. Its expenditures during the years 1910 to 1912, inclusive, in the development of a process of such manufacture were as much a capital item in 1920 as they were in 1913 or 1914. The taxpayer has lost none of the benefit of its capital outlay during these years. The charging off of the capital outlay in 1914 to surplus did not change the character of the expenditure so far as the computation of invested capital is concerned. Invested capital does not depend upon the manner in which the taxpayer's books are kept. At most the books are only evidentiary. We conclude that the taxpayer is entitled to reinstate in its surplus account $396,884.13 of the $398,934.39 charged off to surplus in 1914. The Commissioner has allowed the reinstatement in surplus of $198,167.76. The balance of the $396,884.13 should also be restored. *Appeal of Goodell-Pratt Co.*, 3 B. T. A. 30.

> *Judgment will be entered on 15 days' notice, under Rule 50.*